IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ASSOCIATION MEMBER BENEFITS ADVISORS, LLC, | § § § | |
| Plaintiff/Counter-Defendant, | § § | |
| v. | § § | 1:21-CV-688-RP |
| TEXAS RETIRED TEACHERS ASSOCIATION, | § § § § | |
| Defendant/Counter-Plaintiff, | § § | |
| and | § § | |
| TRIDENT BENEFITS & CONSULTING, LLC, MARCOS JOSE VELA, CAS M. SHARPE, ENTRUST, LLC d/b/a 90 DEGREE BENEFITS, TIMOTHY R. LEE, | § § § § § | |
| Defendants, | § § | |
| v. | § § | |
| AMERICAN SENIOR BENEFITS ASSOCIATION, | § § § § | |
| Counter-Defendant. | § | |

## ORDER

Before the Court are Defendant/Counter-Plaintiff Texas Retired Teachers Association's ("TRTA") Application for Preliminary Injunction, (Dkt. 14), and Plaintiff/Counter-Defendant Association Member Benefits Advisors, LLC's ("AMBA") Application for Preliminary Injunction, (Dkt. 36). The Court held the preliminary injunction hearing on October 21, 2021. (Dkt. 47). Having considered the parties' arguments, the evidence presented, and the relevant law, the Court **DENIES** TRTA's application for a preliminary injunction and **GRANTS** AMBA's application for a preliminary injunction to the extent described in this order.

# I. BACKGROUND

TRTA is the nation's largest association of retired teachers. (TRTA Appl. Prelim. Inj., Dkt. 14, at 6). AMBA offers certain insurance products to TRTA members. (Orig. Pet., Dkt. 1-1, at 6). At issue here are dental and vision plan products, for which AMBA is the exclusive agent of record and third-party administrator. (*Id.*).

In 2004, AMBA and TRTA entered into a contract (the "2004 Contract") that made AMBA the exclusive agent of record and third-party administrator of dental and, by amendment, vision products for TRTA members. (2004 Contract, Dkt. 36-1, at 2; 2005 Amendment, Dkt. 36-1, at 5). The 2004 contract is not limited by any term of years. (2004 Contract, Dkt. 36-1, at 2). In 2011, AMBA and TRTA entered into a second agreement (the "2011 Contract") for TRTA to endorse certain other AMBA products, for a term of ten years. (2011 Contract, Dkt. 14-2, at 3, 6). In June 2021, the 2011 Contract expired. Consistent with the contract's terms, TRTA gave AMBA 180-days written notice of its intent not to extend the 2011 Contract. (TRTA Appl. Prelim. Inj., Dkt. 14, at 7). The parties dispute whether the 2004 Contract is still in force.

After providing notice to AMBA, TRTA began requesting data from AMBA regarding AMBA's group policies in order to facilitate the transition to a new agent and administrator. (*Id.*). In addition, TRTA entered into negotiations with Defendants Trident Benefits and Consulting, LLC, ("Trident"), Marcos Jose Vela ("Vela"), Cas M. Sharpe, ("Sharpe"), and Entrust, LLC ("Entrust") to replace AMBA as agent of record and third-party administrator for dental and vision products. (Orig. Pet., Dkt. 1-1, at 7). AMBA, in turn, began developing new plans with its affiliate, Third-Party Defendant American Senior Benefits Association ("ASBA"). Under ASBA's assumed name Texas Retired Educators Alliance ("TREA"), AMBA and ASMBA began offering insurance products similar to those AMBA previously provided through TRTA. (Orig. Counter Pet., Dkt. 1-1, at 51).

On June 22, 2021, AMBA filed a Petition, Application for Temporary Restraining Order, and Application for Temporary Injunction and Permanent Injunction in the 459th District Court of Travis County, Texas. (Orig. Pet., Dkt. 1-1, at 3). It brought claims for (1) breach of contract against TRTA regarding the 2004 Contract; (2) tortious interference with an existing contract against TRTA, Trident, Vela, Sharp, and Entrust; and (3) tortious interference with prospective relations against all Defendants. (*Id.* at 9–12).

On July 9, 2021, TRTA filed a Counterclaim Petition and Application for Injunctive Relief, (Orig. Counter Pet., Dkt. 1-1, at 42), against AMBA and ASBA. TRTA sought alternatively (1) a declaratory judgment that the 2011 Contract superseded the 2004 Contract; (2) a declaratory judgment that the 2004 Contract is terminable at will because it is an agreement of indefinite duration; or (3) a declaratory judgment that AMBA breached a fiduciary duty thereby terminating the 2004 Contract. (*Id.* at 54–58). TRTA also sought a declaratory judgment that the 2011 Contract's "Agent of Record" provision was terminable at will. (*Id.* at 58). In addition, TRTA brought claims for (1) breach of fiduciary duty by AMBA in its role as agent and third-party administrator for its insurance products; (2) aiding and abetting of such breach by ASBA; (3) conspiracy by ASBA for the same; (4) tortious interference with an existing contract by AMBA, with respect to TRTA's new insurance contracts; (5) common law unfair competition by ASBA; and (6) false advertising by ASBA. (*Id.* at 58–62).

On June 23, 2021, the parties entered an agreement under Texas Rule of Civil Procedure 11 ("Rule 11 Agreement") that, until the court ruled on AMBA's pending motion for temporary injunctive relief, "TRTA will take no action to change AMBA's status as either agent of record or administrator of the dental and vision blocks of business which are the subject of this suit[,]" and "AMBA will take no action adverse to TRTA's member's group coverage remaining in place." (Rule 11 Agreement, Dkt. 44-6, at 3). *See* Tex. R. Civ. Pro. 11.

3

On August 6, 2021, ASBA removed the action to the United States District Court for the Western District of Texas. (Notice of Removal, Dkt. 1). TRTA and AMBA filed their preliminary injunction motions on August 26 and October 12, respectively. (TRTA Mot. Prelim. Inj., Dkt. 14; AMBA Mot. Prelim. Inj., Dkt 36). On August 30, AMBA filed a Motion for Leave to File its First Amended Complaint and Add Defendant Party, (Mot. for Leave, Dkt. 18), which the Court granted on October 20, 2021, (Order, Dkt. 43). AMBA added claims against Defendant Timothy Lee ("Lee"), TRTA's Executive Director, namely that Lee sent inflammatory communications to AMBA and ASBA's customers following the commencement of this action to undermine AMBA and ASBA's business. (Am. Compl., Dkt. 44, at 15). AMBA claimed that this conduct constituted a violation of the Rule 11 Agreement, in addition to amounting to business disparagement and defamation on the part of Lee and TRTA. (*Id.* at 21–22; 27–32). The Court heard legal argument and evidence from the parties at a preliminary injunction hearing on October 21, 2021. (Dkt. 47).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION

TRTA seeks an injunction (1) ordering AMBA to provide TRTA its data on the identity and insurance history of TRTA members enrolled in AMBA plans; (2) enjoining AMBA from interfering

with efforts by TRTA plan providers to provide the same information to TRTA; (3) enjoining

AMBA from interfering with development, marketing, or administration of new insurance plans

sponsored by TRTA, including through the other Defendants; and (4) enjoining ASBA from

communicating in writing or by telephone with TRTA members to market insurance products under

the TREA name. (TRTA Mot. Prelim. Inj., Dkt. 14, at 24). AMBA seeks an injunction (1) ordering

TRTA to cease efforts to replace AMBA as the exclusive agent of record and third-party

administrator for AMBA's dental and vision plans; (2) ordering Defendants Trident, Vela, Sharp,

Entrust, and Lee to cease communicating with TRTA members regarding AMBA and to cease

efforts to replace AMBA as exclusive agent of record and third-party administrator for its dental and

vision plans; (3) ordering Defendants to cease interference with the 2004 Contract and AMBA's

other business relationships; (4) ordering TRTA and Lee to cease and retract any communications to

TRTA members or others, including through TRTA's websites, that disparage or defame AMBA; (5)

enjoining Defendants from any efforts to offer new dental or vision programs until final judgment

in this action; (6) ordering Defendants to cease any conduct in breach of the Rule 11 Agreement; (7)

ordering specific performance of the Rule 11 Agreement; and (8) awarding actual, exemplary, and

punitive damages and attorney's fees and costs. (AMBA Mot. Prelim. Inj., Dkt. 36, at 26).

*A. Likelihood of Success on the Merits*

The merits in this action turn in large part on the survival and validity of the 2004 Contract.

Resolution of those issues untangles most of the parties' disputes as to breach of contract and

interference with business relations, including the claims against Entrust, Trident, Sharpe, and Vela.

In addition, TRTA's entitlement to AMBA's customer data is at issue, as is Lee and TRTA's conduct

in their communications to customers following the commencement of this action. The Court will

treat each of these issues in turn.

1.   <u>Whether the 2004 Contract Likely Remains in Force</u>

To establish breach of contract under Texas law, a moving party must show (1) a valid contract; (2) that the movant performed or tendered performance; (3) that the non-moving party breached the contract; and (4) injury to the movant arising from the breach. Breach. *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 355 (Tex. App.—San Antonio, 1998, pet. denied). In determining breach, the Court must begin by establishing the meaning of the contract based on the intent of the parties, looking to "the agreement itself and the surrounding circumstances . . . ." *Southern Bell Telephone & Telegraph Co. v. Florida East Coast Railway Co.*, 399 F.2d 854, 856 (5th Cir. 1968). In this analysis, "[t]he court should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979). Here, the Court must look to the text and circumstances of the 2004 and 2011 Contracts to ascertain whether the 2004 Contract likely remains in force.

a.   <u>Whether the 2004 Contract Was Superseded</u>

TRTA claims that the 2011 Contract superseded the 2004 Contract. (TRTA Mot. Prelim. Inj., Dkt. 14, at 14). Were this the case, the 2004 Contract would no longer be in force, the 2011 Contract would be validly terminated, and no contractual relationship would remain between AMBA and TRTA, so the argument goes. TRTA grounds its claim in what it terms the "entireties" clause in the 2011 Contract. The clause reads: "This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes and prior written or oral understanding between the parties with respect to the subject matter hereof." (2011 Agreement, Dkt. 14-2, at 8). According to TRTA, because "[b]oth the 2004 and 2011 Agreements pertain to the

subject matter of marketing insurance products to TRTA member[,]" "the 2011 Agreement superseded the 2004 Agreement." (TRTA Mot. Prelim. Inj., Dkt. 14, at 14).

According to AMBA, however, the 2011 Contract did not supersede the 2004 Contract; rather, the 2004 Contract continues to govern the relationship between TRTA and AMBA. To support its claim, AMBA points to a July 2020 email indicating Lee and TRTA's understanding that the governing contract "does not allow for . . . assignment [of agent of record status] under the existing terms." (AMBA Mot. Prelim. Inj., Dkt. 36, at 9–10). This statement references a term in the 2004 Contract under which TRTA designates "AMBA as the exclusive agent of record and third party administrator for any and all dental insurance programs developed for TRTA by AMBA." (2004 Agreement, Dkt. 36-1, at 4). Absent a breach of fiduciary duty or failure to comply with external industry rules, AMBA was to "remain the agent of record and third party administrator for the TRTA dental insurance plan, developed by AMBA, for the duration of its existence." (*Id.*). By the parties' conduct, then, it appears likely that the 2004 Contract remained operative well into the term of the 2011 Contract.

The language of the 2011 Contract itself—the "entireties" clause included—evinces no intent to replace the 2004 Contract. Rather, the 2011 Contract states explicitly that it "replaces the Agreement between United Teacher Associates Insurance Company and [TRTA] dated June 19, 2001," and "also replaces the Association Endorsement Agreement between [TRTA] and [AMBA] dated December 10, 2004 . . . ." (2011 Contract, Dkt. 36-2, at 2). The December 10, 2004 Agreement referenced there is a different agreement than the 2004 Contract, dated May 14, 2004, at issue in this case. It is evident, then, that the parties new how make clear their intent to replace a

contract if they wished to do so. Nothing in the 2011 Contract suggests that was the intent of the parties with respect to the 2004 Contract.

As to the "entireties" clause, it purports to supersede any prior agreements "with respect to the subject matter hereof." (2011 Contract, Dkt. 36-2, at 8). According to TRTA, the "subject matter" in question is "marketing insurance products to TRTA members"—or the totality of AMBA's business with TRTA. (TRTA Mot. Prelim. Inj., Dkt. 14, at 14). But AMBA argues that the phrase should not be read so broadly. Rather, according to AMBA, the "subject matter" refers only to specifically enumerated "endorsed products," defined in the agreement to mean "Long-Term Care/Home Health Care Policy, Single Premium Tax Deferred Annuity, Cancer and Dread Disease Policy, Final Expense Life Insurance Policy and Medicare Supplement Insurance Policy, Medical Air Service Association Membership Plan, Identity Theft Plan, and a Homeowners and Automobile Insurance Program endorsed by TRTA pursuant to this Agreement." (AMBA Mot. Prelim. Inj., Dkt. 36-2, at 2; *see* AMBA Resp., Dkt. 27, at 7). Nowhere in that list are the dental or vision products covered in the 2004 Contract. The question remains, then, whether the "subject matter" of the 2011 Contract is each and every insurance product offered by AMBA or only those endorsed products enumerated in the 2011 Contract itself.

The Court finds it more likely that the 2011 Contract controls only those products that it references by its own language. Courts regularly decline to "rewrite agreements in insert provisions parties could have included or to imply restraints for which they have not bargained." *Addicks Services v. GGP-Bridgeland, L.P.*, 596 F3d 286, 297 (5th Cir. 2010) (quoting *Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 646 (Tex. App.—Texarkana 2005, no pet.)). TRTA claims that another provision of the 2011 Contract, granting "AMBA the right of first refusal for any other insurance or related products to be offered to TRTA members[,]" extends the subject matter of the agreement to include all of AMBA's insurance products. (2011 Contract, Dkt. 36-2, at 3; *see* TRTA Reply, Dkt. 29, at 5).

But the inclusion of this clause alone likely does not save the contract from the more limited interpretation urged by AMBA. And even if it were to bring other, non-enumerated products within the ambit of the contract, it still would not touch on the *existing* dental and vision services covered in the 2004 Contract. Thus, it is unlikely that the 2011 Contract superseded the 2004 Contract.

b.   <u>Whether the 2004 Contract is Otherwise Terminated</u>

In the event that the Court finds, as is likely, that the 2004 Contract was not superseded, TRTA offers two alternative theories under which the Curt can still invalidate the 2004 Contract: (1) the 2004 Contract was an agreement of indefinite duration and therefore terminable at will; and (2) AMBA breached a fiduciary duty and thereby terminated the 2004 Contract.[1] (TRTA Mot. Prelim. Inj., Dkt. 14, at 13–16). The Court finds all three arguments unlikely to succeed.

First, TRTA claims that the 2004 Contract constitutes a perpetual contract, and as such is terminable at will. It is true that, "[u]nder Texas law, 'when a contract contemplates continuing performance (or successive performances) and [is] indefinite in duration,' it may be terminated at the will of either party[,]" and that "'this circuit does not favor perpetual contracts' and 'presumes that [any such] contract is terminable at will.'" *Trient Partners I Ltd. v. Blockbuster Ent. Corp.*, 83 F.3d 704, 708 (5th Cir. 1996) (quoting *Delta Serv. & Equip., Inc. v. Ryko Mfg. Co.*, 908 F.2d 7, 9 (5th Cir. 1990)) (cleaned up). In *Trient*, the case on which TRTA primarily relies, the Fifth Circuit considered a contract which explicitly provided that it was intended to "continue indefinitely" unless certain conditions materialized. *Id.* at 709. The court explained, "[w]e will not hold that a contract is definite in duration when it (1) expressly states that it will 'continue indefinitely,' *and* (2) is confined in time only by 'termination provisions' which contain conditions that are likely never to transpire." *Id.*

---

[1] Finally, TRTA claims that the Agent of Record provision in the 2011 Contract is terminable at will because it is indefinite. (TRTA Mot. Prelim. Inj., Dkt. 14, at 15). The terminability of the 2011 Contract has no bearing on the 2004 Contract's effect, so is immaterial to the Court's determination of likelihood of success on the merits.

Here, neither condition is fulfilled: the 2004 Contract does not explicitly claim indefiniteness, nor does it include termination conditions unlikely ever to transpire. The court in *Trient* was concerned, above all, that the contract there not "bind a franchised commercial business to operate in perpetuity." *Id.* at 710. Here, no such result would occur from allowing the 2004 Contract to remain in force. For by its terms, the contract terminates when the policy in question terminates; nothing in the contract obligates AMBA to continue to provide its products indefinitely. (*See* 2004 Contract, Dkt. 36-1, at 4).

However, there is a difference "between contracts of indefinite duration and contracts that specify determinable events." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 842 (Tex. 2010) (finding not terminable at will a contract specifying that its terms would terminate "upon the [Defendant's] purchase of the facilities" because "Purchase of the Facilities" is an ascertainable event which both parities can identify."). Indeed, where "the language of th[e] contract makes a fixed and determinable term, . . . the rule of law that a contract may be terminated at the end of a reasonable time does not apply . . . ." *City of Big Spring v. Bd. of Control*, 404 S.W.2d 810, 816 (Tex. 1966). In *Big Spring*, the Texas Supreme Court found definite a term specifying that an "agreement with reference to the furnishing of water by the City to [a] hospital shall continue in full force and effect and is not subject to being revoked as long as the State of Texas shall in good faith maintain and operate said hospital on said site." *Id.* at 815. The Court explained that "[w]ords which fix an ascertainable fact or event, by which the terms of a contract's duration can be determined, make the contract definite and certain in that particular." *Id.* (quotations omitted); *see also Besco, Inc. v. Alpha Portland Cement Co.*, 619 F.2d 447, 449 (5th Cir. 1980) ("[T]he contract is of indefinite duration in one respect, since its length is not defined in units of time in such a manner that a termination date is clear from its inception," but "it may not 'be terminated at any time by either party' because the parties have 'otherwise agreed' to limit [Defendant's] termination rights in the manner clearly

disclosed . . . .") (citation omitted); *Rolling Lands Invs., L.C. v. Nw. Airport Mgmt., L.P.*, 111 S.W.3d 187, 197 (Tex. App.—Texarkana 2003), *as clarified* (July 3, 2003) ("When a contract limits duration by the happening of any one of several ascertainable contingencies it is not terminable at will."). Just as the duration of the good faith maintenance and operation of a hospital on a specified site was found to be a sufficiently definite term in *Big Spring*, here it is likely that the duration of the operation of an insurance policy, absent breach of fiduciary duty or violation of industry rules, is likewise a definite term under Texas and Fifth Circuit law. Thus, TRTA is unlikely to succeed in this argument.

Second, TRTA claims that AMBA owes it a fiduciary duty, as agent of record under the 2004 Contract plans, and that it breached such duty by purportedly acting against the interests of TRTA members and competing with TRTA through ASBA. (TRTA Mot. Prelim. Inj., Dkt. 14, at 17). But AMBA does not owe TRTA a generalized fiduciary duty, outside of its limited responsibilities as agent of record and third-party administrator of the dental and vision plans. Its duties as agent and administrator extend to holding insurance premiums for customers and ensuring that such funds are used properly. (AMBA Resp., Dkt. 27, at 11). The mere word "agent" in the term "agent of record" does not alone create an agency relationship. And the agent of record status is distinct from an agency relationship that carries the implication of a fiduciary duty, as AMBA is correct to note. (AMBA Resp., Dkt. 27, at 4); *see Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 701 (Tex. 2007) (holding that the Texas Insurance Code "does not create a general fiduciary duty applicable to third-party administrators"); *see also id.* at 702 (Under the common law, "a contractual obligation does not generally give rise to a fiduciary duty . . . ."). Rather, AMBA operates as an independent contractor in its contractual relationships with TRTA. Indeed, the 2011 Contract affirms, "None of the provisions of this Agreement are intended to create . . . any relationship between TRTA and AMBA other than that of independent contractors" nor allow "the parties to this Agreement . . . [to] be construed to the agent . . . of any other." (2011 Contract, Dkt. 36-2, at 70.

(Hr'g Tr., at 17–18). There being no fiduciary duty for AMBA to breach, TRTA is unlikely to succeed on this claim.

Given that AMBA is likely to succeed on its claim that the 2004 Contract was not superseded, and that TRTA is unlikely to succeed on its arguments for invalidating that contract, it appears likely that first two elements for breach of contract can be shown. The evidence makes clear that AMBA is substantially likely to succeed in establishing TRTA's actions in breach of the 2004 Contract—namely engaging with Trident and Entrust to replace AMBA in its role as agent and third-party administrator of dental and vision plans, as guaranteed to AMBA in the 2004 Contract. (AMBA Mot. Prelim. Inj., Dkt. 36, at 9, 14 (listing exhibits)). AMBA has similarly presented sufficient evidence to establish its likelihood of establishing injury result from the breach, in the form of lost customers and business reputation. (*Id.* at 8). Thus, the Court finds that AMBA is substantially likely to succeed on its breach of contract claims.

   2.   Whether AMBA is Likely to Succeed in its Claims Against the Non-TRTA Defendants

   AMBA claims that Defendants Trident, Entrust, Vela, and Sharp (the "non-TRTA Defendants") are tortiously interfering with its contract with TRTA to be the exclusive provider of dental and vision products to TRTA's members. To establish tortious interference with a contract under Texas law, the movant must establish: (1) a valid contract; (2) willful and intentional interference with the contract by the non-moving party; (3) that the interference proximately caused injury to the movant; and (4) actual damage or loss. *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). Critical to establishing this claim is that the interference itself must be *willful and intentional. See Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 926-27 (Tex. 1993); *Southwestern Bell Tel. Co. v. John Carlo Tex.*, Inc., 843 S.W.2d 470, 472 (Tex. 1992). To establish such intent, the movant must show (1) actual knowledge of the contract, or (2) sufficient knowledge of surrounding

facts and circumstances such that a reasonable person would believe a contract was in place. *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 656 (Tex. App.—Corpus Christi 1991, writ denied).

To succeed in its tortious interference claim, AMBA must present evidence to establish that the non-TRTA Defendants had knowledge of the 2004 Contract sufficient to demonstrate intent to interfere. At the hearing, the non-TRTA Defendants presented evidence tending to show that they lacked knowledge of either the 2004 Contract or the Rule 11 Agreement. (Hr'g Tr. at 33, 36, 183); (*see* Entrust Resp., Dkt 40, at 2; Trident Resp., Dkt. 41, at 3). AMBA presented no evidence to sufficiently counter the non-TRTA's presentations to this effect. The Court accordingly finds that AMBA has not presented sufficient evidence to establish a likelihood of success on this claim.

AMBA additionally claims the non-TRTA Defendants tortiously interfered with its prospective business relations. To establish such a claim, a movant must show (1) a reasonable probability that the movant would have entered a business relationship with a third party; (2) the non-movant acted with the intent to prevent the relationship from coming into being or with sufficient knowledge of the effects of its actions; (3) the non-movant's conduct was independently tortious or otherwise unlawful; (4) the interfering conduct proximately caused injury to the movant; and (5) the movant suffered actual damage or loss. *Coinmach Corp. V. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). This claim too requires AMBA to establish actual knowledge of AMBA's prospective relations on the part of the non-TRTA Defendants. For the reasons discussed above, the Court finds that AMBA has failed to produce sufficient evidence of the non-TRTA Defendants' knowledge and intent to demonstrate a likelihood of success on this claim.

### 3.   Whether TRTA is Likely Entitled to Receive Data from AMBA

TRTA argues that AMBA is tortiously interfering with its contract with Ameritas Life Insurance Corporation ("Ameritas"), its dental insurance provider under AMBA's plan, by refusing to provide TRTA, or allow Ameritas to furnish, data on the insured. There is no question that

13

TRTA and Ameritas had a valid contract. (*See* TRTA Mot. Prelim. Inj., Dkt 14, at 18; Ameritas Policy, Dkt. 29-1). However, TRTA must also identify some right arising out of that contract which AMBA breached by its refusal of access to the data at issue.

TRTA claims entitlement to the data in AMBA's possession under 45 C.F.R. § 164.504(f)(ii-iii),[2] a regulation promulgated under the Health Insurance Portability and Accountability Act ("HIPAA") outlining requirements for disclosure of information to "plan sponsors" of group health plans. TRTA claims that it qualifies as a plan sponsor, entitled to such data, based on plan documents identifying it as such. (*See* Claims Review Procedures, Dkt. 29-1, at 3). However, the insurance documents do not conclusively establish whether TRTA qualifies as a plan sponsor under federal law. The regulation at issue defines a "plan sponsor" by reference to the ERISA statute. 45 C.F.R. § 164.103 ("Plan sponsor is defined as defined at section 3(16)(B) of ERISA, 29 U.S.C. 1002(16)(B)."). The ERISA statute, 20 U.S.C. 1002, in turn defines "plan sponsor" exclusively as an entity in an employer-employee relationship to the customer:

> "plan sponsor" means (i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan, or (iv) in the case of a pooled employer plan, the pooled plan provider.

29 U.S.C.A. § 1002. This definition does not include a loosely defined industry group for retired members, of the type that TRTA holds itself out to be. TRTA does not purport to be an employer, and so does not qualify as a plan sponsor under the ERISA statute. (*See* TRTA Mot. Prelim. Inj., Dkt. 14, at 5 ("TRTA is an association consisting of tens of thousands of retired

---

[2] In its closing argument, TRTA also for the first time asserted a right to the customer data under Texas Insurance Code § 1215.003. Because TRTA did not timely raise this argument, the Court finds that it is waived.

Texas teachers. TRTA sponsors and provides group insurance benefits to these retired educators."").

That the policies TRTA sponsors use the same terminology is an unfortunate coincidence of

draftsmanship, not a conclusive legal argument. Therefore, it is substantially likely that TRTA does

not qualify as a plan sponsor under federal law. Because TRTA identifies no contract provision nor

rule of law giving it a right to the data, AMBA could not have interfered with a contract by refusing

to perform in a way that it had no obligation to.[3] Thus, TRTA is not likely to be successful in

establishing that AMBA interfered with a contract right which did not exist, nor that it proximately

caused any injury through its conduct. The Court thus finds that TRTA is unlikely to succeed on this

claim.

    4.   <u>Whether TRTA is Likely to Succeed in its False Advertising and Unfair Competition Claims</u>

        TRTA raises claims for false advertising and unfair competition arising out of ASBA's

marketing to its customers under the TREA name and logo. The Lanham Act makes it unlawful:

> to use[] in commerce any word, term, name, symbol, or device, or any combination thereof, .
> . . which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or as to the origin,
> sponsorship, or approval of his or her goods, services, or commercial activities by another
> person, or (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's goods,
> services, or commercial activities.

15 U.S.C. § 1125(a). And under Texas law, "unfair competition includes a number of types of

objectionable trade practices, including trademark infringement, dilution of good will,

misappropriation of business value, 'palming off,' and theft of trade secrets[,]" which "require[] that

the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to

conduct its business." *Healthpoint, Ltd. v. River's Edge Pharms., LLC*, 2005 WL 356839, at *3 (W.D.

Tex. Feb. 14, 2005).

---

[3] Indeed, AMBA adds that under HIPAA, it was *prohibited* from sharing the information with TRTA—not
that it merely declined to do so. (*See* AMBA Resp., Dkt. 27, at 12).

TRTA claims that ASBA, and AMBA by extension, have engaged in both false advertising and unfair competition by (1) use of the name Texas Retired Educators Alliance (TREA); and (2) use of a logo TRTA alleges is confusingly similar to TRTA's own logo. The Court finds neither of these bases likely to succeed. TRTA's claims will likely fail if the purportedly infringing logo and acronym are not so similar as to cause confusion with the TRTA acronym and logo. As to the logo, TRTA alleges that TREA's use of a circle surrounding the State of Texas is confusingly similar to its own logo of the same description. But as was made clear through ASBA's hearing testimony, many organizations, including in the education industry, use logos that fit this description. (Hr'g Tr. at 117; ASBA Resp., Dkt. 46, at 4). Moreover, the logo in question is merely one of many of TRTA's logos and is not the logo it currently uses for its website, social media, or print publications. (Hr'g Tr. at 118 –119; ASBA Resp., Dkt. 46, at 6–7). As to the acronym, the fact that two acronyms for organizations providing similar services to similar groups of people in similar areas does not give rise to a legal claim. As ASBA notes, under trademark law, generic terms such as those at issue here are not protectable because they merely identify the "basic nature of services" provided "rather than the more individualized characteristics of a particular product . . . ." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241 (5th Cir. 2010); (*see* ASBA Resp., Dkt. 46, at 7). To the extent that TRTA raises a trademark infringement claim at this stage, then, the Court finds it unlikely that TRTA can establish any trademark in the TRTA name or logo in question, nor a likelihood of confusion associated with the logo or the TREA name. TRTA has far from met its evidentiary burden to establish a likelihood of consumer confusion as to either the logo or the name. Given these considerations, the Court finds TRTA is unlikely to succeed on these claims.

5. <u>Whether AMBA is Likely to Succeed in its Claims for Business Disparagement and Defamation</u>

AMBA claims that TRTA and Lee's communications to TRTA members regarding TREA during the summer of 2021 constitute business disparagement and defamation. Under Texas law, a claim of business disparagement requires proving (1) a false statement; (2) published with malice; (3) with intent to cause pecuniary loss or knowledge that such loss will occur; and (4) actual pecuniary loss. *Innovative Block of S. Texas, Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020). "Business disparagement encompasses falsehoods concerning the condition or quality of a business's products or services that are intended to, and do in fact, cause financial harm." *Id.* As to defamation, under Texas law, this tort requires establishing (1) publication of a false statement of fact to a third party; (2) which statement was defamatory in nature towards the plaintiff; (3) arising from fault on the part of the non-moving party, at least rising to the level of negligence; and (4) in some cases, damages. *Id.* A defamatory statement is one which has a tendency "to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* A defamation claim requires that the statement in question be false. *See Neely v. Wilson*, 418 S.W.2d 52, 62 (Tex. 2013). As the Texas Supreme Court has noted, business disparagement is geared towards economic interests, whereas defamation looks to reputational injury. *Innovative Block*, 603 S.W.3d at 417; *see Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014).

AMBA identified two mass email communications from TRTA and Lee to TRTA members in August 2021 as the source of its business disparagement and defamation claims. (Lee Email 1, Dkt. 36-6; Lee Email 2, Dkt. 36-7). Without expressing any opinion as to the other factors, the Court finds that AMBA has failed to present sufficient evidence of actual pecuniary loss—tied to the communications specifically—to demonstrate a likelihood of success on the merits of its business disparagement claim. AMBA's defamation claim is closer: there can be no doubt that the emails could lead to implications regarding AMBA's reputation on the part of readers. However, the Court

struggles to locate any specific "false statement[s] of fact" necessary to sustain a defamation claim. Given the extraordinary nature of the preliminary injunction as a remedy, the Court declines at this time to award relief on this basis. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).

### B. Irreparable Harm

TRTA claims it faces a substantial threat of irreparably harm from its inability to access the data it seeks in AMBA's possession, which are necessary to ensure that its members are receiving insurance benefits. It further asserts that it would suffer immeasurable damages absent an injunction against ASBA's competition and advertising. (TRTA Mot. Prelim. Inj., Dkt. 14, at 22). AMBA claims TRTA's breach of the 2004 Contract and other business relationships cannot be reversed, and the damage it caused cannot be quantified. (AMBA Mot. Prelim. Inj., Dkt. 36, at 21).

To establish irreparable harm, a party must demonstrate a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) ("[A] harm is irreparable where there is no adequate remedy at law, such as monetary damages."). Courts have long held that "a finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989) (quotation omitted); *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004) ("[A] plaintiff can prove there is no adequate remedy at law where damages cannot be calculated.").

Here, TRTA's assertions regarding irreparable harm are unconvincing. As has been discussed, TRTA likely has no right to the data it seeks, and so suffers no legal harm from being unable to access such data. Further, TRTA members are ensured the option of continuity of coverage even if AMBA is no longer the agent of record and third-party administrator of its dental and vision plans, through individual conversion plans. (Hr'g Tr. at 52–53). Finally, any lost member accounts are likely able to be calculated and compensated in damages. Therefore, the Court finds that TRTA has not made the requisite showing of irreparable harm necessary to sustain preliminary injunctive relief.

On the other hand, AMBA more persuasively notes that the cancelation of its contract and its replacement in TRTA-sponsored plans will cause a significant loss of revenue, current and future customers, and reputation—the last of which is particularly difficult to calculate. *See Alamo Lights, LLC v. Four Bros Lighting & Bulbs, Inc.*, 1:18-CV-187-RP, at *4 (W.D. Tex. Mar. 20, 2018). In addition, AMBA claims its losses are likely in excess of Defendants' net worth, and so Defendants would be unable to compensate it even if damages were sufficient. (AMBA Mot. Prelim. Inj., Dkt. 36, at 21). *See DSI Ventures, Inc. v. Sundin*, No. 6:17-CV-00498-RWS, 2017 WL 11473288, at *1 (E.D. Tex. Sept. 27, 2017) (citing *Janvey*, 647 F.3d, at 600 ("An exception to [the] general rule exists when it is shown that a money judgment will go unsatisfied absent equitable relief, such as when the target of the injunction is insolvent or is likely to transfer or dissipate assets to avoid payment.")). Thus, the Court finds that AMBA plausibly argues that it will face irreparable harm absent an injunction.

*C. Balance of Equities*

Movants must also establish that their irreparable harm is greater than the hardship that the preliminary injunction would cause the non-moving party. *Sirius Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 842 (W.D. Tex. 2015). TRTA claims that AMBA and ASBA will suffer no harm from an injunction because they have no contractual rights in force which can be infringed. (TRTA Mot.

Prelim. Inj., Dkt. 14, at 22–23). AMBA counters that the only harm TRTA will suffer is maintenance of the status quo, as agreed to in the Rule 11 Agreement. (AMBA Mot. Prelim. Inj., Dkt. 36, at 22). Although the parties' positions have changed since entering into that agreement, the Court agrees with AMBA that the injury TRTA would suffer from returning to a position to which it previously agreed is outweighed by the injury AMBA will likely suffer to its customer base and business reputation absent an injunction.

### D. Public Interest

Finally, the Court must address the interests of the public in an injunction at this stage of the proceedings. "The focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Conceal City, LLC v. Looper Law Enforcement, LLC*, 2011 WL 5557421 at *8 (N.D. Tex. 2011). The parties make essentially the same argument here: that the public will be served by ensuring that retired teachers continue to receive insurance benefits without compounding their confusion. (TRTA Mot. Prelim. Inj., Dkt. 14, at 23; AMBA Mot. Prelim. Inj., Dkt. 36, at 24). The Court finds that the public interest would not be disserved by a preliminary injunction in this matter.

### IV. CONCLUSION

This Order constitutes the Court's findings of fact and conclusions of law. For the reasons discussed above, **IT IS ORDERED** that:

1. TRTA's Application for Preliminary Injunction, (Dkt. 14), is **DENIED**.

2. AMBA's Application for Preliminary Injunction, (Dkt. 36), is **DENIED** as to its claims against Entrust, Trident, Sharpe, and Vela, and as to its claims for business disparagement and defamation.

3.  AMBA's Application for Preliminary Injunction, (Dkt. 36), is **GRANTED** as to its remaining claims against TRTA and Lee only insofar as the Court will enter the following preliminary injunction. Any request for relief not granted is denied.[4]

4.   Until the Court enters judgment in this case, or until otherwise provided by the Court, TRTA is enjoined from interfering with the 2004 Contract and AMBA's other business relationships. Specifically, TRTA and Lee are ordered to cease efforts to replace AMBA as the exclusive agent of record and third-party administrator for its dental and vison products; to cease any communications with TRTA member to this effect; and to cease efforts to develop new dental or vision products to replace or compete with AMBA's products. Further, TRTA is ordered to cease efforts to obtain the contested data from AMBA, including through its contractors.

**SIGNED** on December 9, 2021.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[4] Federal Rule of Civil Procedure 65(c) requires a court to order "security in an amount that the court considers proper" upon entry of a preliminary injunction. Under Fifth Circuit law, "[t]he amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all. *Corrigan Dispatch Co. v. Casa Guzman*, S. A., 569 F.2d 300, 303 (5th Cir. 1978). *See EOG Res. Inc. v. Beach*, 54 F. App'x 592, 2002 WL 31730385, at *1 n.2 (5th Cir. 2002) ("In this circuit, . . . courts have the discretion to issue injunctions without security."); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all.") (quotations omitted). As such, the Court finds that based on the strength of AMBA's case, and the lack of potential harm to Defendants arising out of the ordered relief, it is unnecessary to order bond at this time. *See Alpert v. Riley*, No. CIV.A. H-04-CV-3774, 2010 WL 1254286, at *3 (S.D. Tex. Mar. 29, 2010).